IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

        Plaintiff,

v.                 //    CRIMINAL ACTION NO. 1:12CR113
                                  (Judge Keeley)

ALLEN G. SAOUD,

        Defendant.

## MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]

The Government instituted this civil contempt proceeding on April 21, 2017, when it moved for an order directing attorney Paul Harris ("Harris") to show cause why he should not be held in civil contempt for converting restrained assets to pay attorney's fees (Dkt. No. 265). Since that time, the Court has conducted three hearings on the motion, including an evidentiary hearing (Dkt. Nos. 279; 289; 301), and has received post-hearing briefs from the parties (Dkt. Nos. 311; 312). After considering the record and applicable law, concluding that the Government has not met its burden to establish that Harris should be held in contempt, the Court **DENIES** the motion (Dkt. No. 265).

## I. FINDINGS OF FACT

On December 4, 2012, a grand jury sitting in the Northern District of West Virginia returned a 23-count indictment against the defendant, Allen G. Saoud ("Saoud"), charging him with health

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

care and bankruptcy fraud, among other offenses (Dkt. No. 1). The grand jury subsequently returned two superseding indictments (Dkt. Nos. 29; 56). Although Saoud initially was represented by attorney Stephen G. Jory, the Court granted Harris's motion to substitute as counsel on January 17, 2013 (Dkt. No. 19).

On June 25, 2013, following a ten-day jury trial, Saoud was convicted of thirteen counts of health care fraud, one count of aggravated identity theft, one count of concealment of a health care matter, one count of a corrupt endeavor to obstruct and impede the due administration of internal revenue laws, five counts of bankruptcy fraud, and one count of false statement to a federal agent (Dkt. No. 106). On August 13, 2013, the Government moved for a preliminary order of forfeiture reflecting a forfeiture money judgment of $1,243,118.29 against Saoud (Dkt. No. 118).

On November 15, 2013, the United States Probation Office disclosed Saoud's Presentence Investigation Report ("PSR") (Dkt. No. 290 at 2). Following a review of the PSR, Harris filed nine written objections, after which a revised PSR was filed on December 12, 2013. Id. at 2, 66-81. In an effort to calculate Saoud's net worth, and thus his ability to pay a fine, the Probation Officer compiled a list of Saoud's assets, including his equity interest in more than $11.9 million of real property. Id. at 52-56. Notably,

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

the PSR acknowledged that the assets "include personal assets and
assets owned by ACC Properties, LLC; Allen-Sean Subsidiaries, LLC;
Titanium Real Estate; AGS Development, LLC; and Prime Space, LLC."
Id. at 54. Saoud did not object to the characterization of his
interest in these assets, despite the fact that they were titled to
limited liability companies that he shared with his wife, Jennifer
Saoud ("Mrs. Saoud").[1]

On January 3, 2014, attorney Robert G. McCoid ("McCoid") noted
his appearance for Saoud (Dkt. No. 151), following which Harris
moved to withdraw as counsel of record on January 7, 2014, because
he had been placed on home confinement by the state of West
Virginia and was unable to meet with Saoud or interview witnesses
(Dkt. No. 154). That same day, Harris and McCoid moved to continue
the sentencing hearing scheduled for January 14, 2014, so that
McCoid could "effectively and adequately prepare for sentencing,"
and also to allow Saoud "ample time to finalize the real estate
transactions necessary to satisfy the Government's forfeiture

---

[1] As of 2014, the companies' tax forms indicated that Mrs.
Saoud owned 99% of Prime Space LLC (Dkt. No. 292-4 at 16), 99% of
AGS Development LLC (Dkt. No. 292-5 at 19), and 50% of Titanium
Properties LLC (Dkt. No. 292-6 at 17). Nonetheless, she testified
that Saoud never discussed real estate transactions with her, and
that she had not been involved in the businesses until Saoud became
incarcerated. Rather, Saoud handled the companies and viewed them
as his own (Dkt. No. 308 at 6).

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

allegations" (Dkt. No. 155). According to the motion, Saoud had

"reached a mature stage of negotiations" with regard to a sale of

the following:

> properties located at 162, 164, and 170 Thompson Drive in
> Bridgeport, West Virginia; a property development located
> at the Mileground in Morgantown, West Virginia[,]
> containing twenty (20) nearly completed townhomes; a
> group of properties located in Jane Lew, West Virginia,
> including eleven (11) apartment units, four (4)
> townhouses, and ten (10) trailer rental spots; and
> Fairmont-based properties that contains [sic] four (4)
> homes located at the Fairmont Homes rental lot and an
> additional lot in Deerfield with foundation already
> finished.

Id. at 3-4. The Court granted the motion and rescheduled Saoud's

sentencing for March 25, 2014 (Dkt. No. 161).

At the sentencing hearing, the Court sentenced Saoud to a

total term of 99 months of incarceration with 3 years of supervised

release to follow (Dkt. No. 170 at 1-3). It also imposed a

mandatory special assessment of $2,200.00, a fine of $2,630,000.00,

and a forfeiture money judgment of $1,243,118.29. Id. at 5-7. The

Court left open the amount of restitution for later determination.

Id. at 5. Harris noted his appearance as appellate counsel on May

30, 2014. Thereafter, on June 5, 2014, the Court amended its

judgment to include an amount of $265,330.04 in restitution (Dkt.

No. 196 at 5).

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

On July 1, 2014, the Government and Saoud, through McCoid, jointly moved the Court "to enter an agreed order restraining certain assets of the defendant" that could be used to satisfy the money judgment and restitution (Dkt. No. 199 at 1-2). At that time, Saoud was "negotiating the sale of several parcels of real estate for approximately $4.5 million" of which he anticipated receiving $2.5 million by January 2015. Id. at 2.

> These properties include[d]: commercial buildings located at 162, 164, and 170 Thompson Drive in Bridgeport, West Virginia; a property development located at the Mileground in Morgantown, West Virginia[,] containing almost twenty (20) nearly completed townhouses; a group of properties located in Jane Lew, West Virginia, including eleven (11) apartment units, four (4) townhouses, and ten (10) trailer rental spots; and Fairmont-based properties that include four (4) homes located at the Fairmont Homes rental lot and an additional lot in Deerfield with foundation already finished.

(Dkt. No. 201 at 2-3). The Government and Saoud agreed that these transactions should move forward so long as Saoud used $1,508,448.33 of the proceeds to satisfy his obligations to the Government and victims in this case (Dkt. No. 199 at 2).

As the parties requested, on July 3, 2014, the Court entered an Agreed Order Restraining Defendant's Assets ("Agreed Order"), which applied to "Defendant's assets pending appeal" (Dkt. No. 201 at 1). The Agreed Order made reference to the forfeiture money

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

judgment and acknowledged the Court's power to restrain substitute

assets under 21 U.S.C. § 853. Id. at 2. It specifically directed

Saoud to deposit $1,508,448.33 from the proposed sales in an

interest-bearing account until after the resolution of his appeal.

Id. at 3-4. In addition, the Agreed Order stated as follows:

> Seventy-five percent (75%) of the proceeds from any other
> real estate transactions shall be placed in escrow up to
> the anticipated amount of forfeiture of one million two
> hundred forty-three thousand one hundred eighteen dollars
> and twenty-nine cents ($1,243,118.29) in addition to
> three hundred thousand dollars ($265,330.04) for
> restitution, and notice shall be provided to the
> Government regarding the consummation of any such real
> estate transactions as well as notice of any property
> sold and the amount of any proceeds obtained from such
> sale(s).

Id. at 4. The properties specifically identified in the Agreed

Order were never actually sold (Dkt. No. 308 at 61-62).

Despite having been removed as counsel of record in January

2014, Harris apparently remained involved in the proposed property

sales (Dkt. No. 307-1 at 79, 86), and also reviewed the Agreed

Order. In point of fact, Harris met with Saoud and McCoid in

February 2014 to review the Agreed Order (Dkt. Nos. 302-10; 307-1

at 80), and in May 2014, shortly before noting his appearance as

appellate counsel, reviewed a draft of the Agreed Order and again

met with McCoid (Dkt. No. 307-1 at 87).

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

Throughout 2014 and 2015, Mrs. Saoud facilitated the sale of the following properties:[2]

| Property Sold | Closing Date | Net Proceeds |
|---|---|---|
| Worthington Drive #4 | October 2014 | $36,936.17 |
| 512 Worthington Drive #3 | October 2014 | $61,032.38 |
| 104 Acres Jack Run | October 2014 | $172,390.01 |
| 512 Worthington Drive #14 | December 2014 | $63,315.33 |
| 512 Worthington Drive #11 | March 2015 | $58,154.62 |
| Worthington Drive #8 | March 2015 | $60,387.73 |
| Natalie Drive (Lot 16 Rosewood Heights) | May 2015 | $31,763.85 |
| 19.55 Acres Woodcrest | June 2015 | $164,774.88 |
| **TOTAL** | | **$648,754.97** |

Although none of these properties (collectively, "the Property") was specifically restrained by the Agreed Order (Dkt. No. 201), each was owned by AGS Development, LLC; Prime Space, LLC; or Titanium Properties, LLC. As discussed, the PSR listed assets of these limited liability companies as assets in which Saoud held an interest (Dkt. No. 290), and Mrs. Saoud testified that Saoud

_____

[2] This chart uses the net proceeds as summarized by the Government (Dkt. No. 311 at 7). Harris contends that several of the amounts are erroneous (Dkt. No. 312 at 2-3), but for purposes of this Memorandum Opinion, the differences are inconsequential.

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

instructed her to sell the properties for the purpose of paying restitution (Dkt. No. 268-3 at 28).

Following each of the sales in 2014 and 2015, Mrs. Saoud tendered the net proceeds to Harris Law Offices and executed a contemporaneous acknowledgment that the funds would "be immediately used to pay towards outstanding legal bills" (Dkt. No. 292-7 at 2). Mrs. Saoud subsequently testified, during both a deposition and an evidentiary hearing in connection with the Government's pending motion, that the funds were meant to be applied to Saoud's restitution (Dkt. No. 268-3; 308 at 14).[3]

Joyce Price ("Price"), Saoud's sister and the accountant for his companies, also testified on two occasions that the net proceeds at issue were to be used "to pay the restitution and fines and penalties" (Dkt. Nos. 278-1 at 8-9; 308 at 28). In fact, on

---

[3] Following Mrs. Saoud's deposition on June 7, 2016, and prior to the evidentiary hearing on October 26, 2017, a former employee of Harris Law Offices procured an affidavit from Mrs. Saoud, purporting to clarify that Mrs. Saoud intended the net proceeds to be applied to attorney fees (Dkt. No. 292-19). Notably, Harris Law Offices prepared and obtained this affidavit in September 2017 despite the fact that Harris has suggested in both May and December 2017 that Mrs. Saoud's testimony is not credible due to her "history of mental health issues" (Dkt. Nos. 274 at 15; 308 at 80-81; 312 at 6 n.1). At the evidentiary hearing, Mrs. Saoud testified that she had signed the affidavit in a car situated in a dark parking lot, and emphasized that she "didn't know anything about the attorney fees" (Dkt. No. 308 at 16-25).

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

2014 and 2015 tax filings for the companies, Price reported significant expenses for "Government fines and penalties," not attorney fees (Dkt. Nos. 302-1 at 4, 16; 302-2 at 4, 13; 302-3 at 15; 302-4 at 11). Nonetheless, according to Harris, he used $352,556.00 of the net proceeds, which had been deposited in the Harris Law Offices trust account, to pay his attorney fees incurred during Saoud's criminal trial (Dkt. Nos. 274 at 6; 312 at 4).[4] The Government contends that, as a consequence of these payments, Harris is in contempt of the Court's forfeiture order and the Agreed Order (Dkt. No. 265).

## II. STANDARD OF REVIEW

"There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." Render's Mkts., Inc. v. Joppatowne G.P. Ltd. P'ship, 608 F. App'x 130, 131 (4th Cir. 2015) (unpublished decision) (quoting Shillitani v. United States, 384 U.S. 364, 370 (1966)); see also Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991). The Court may impose sanctions for civil contempt "to coerce obedience to a court order or to compensate the complainant for losses sustained as a

---

[4] The sales at issue took place after the Court entered its Agreed Order and mostly before Saoud's sentence became final. See Allen G. Saoud v. United States, No. 14-1185, 135 S. Ct. 1909 (Apr. 27, 2015) (denying petition for writ of certiorari).

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

result of the contumacy." In re Gen. Motors Corp., 61 F.3d 256, 258 (4th Cir. 1995) (citation omitted). "The appropriate remedy for civil contempt is within the court's broad discretion." Id. at 259.

Civil contempt is appropriate if the order said to be violated "set[s] forth in specific detail an unequivocal command" that is "clear and unambiguous." Id. Therefore, in order to establish that Harris should be held in civil contempt, the Government must prove by clear and convincing evidence:

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) . . . that the decree was in the movant's 'favor'; (3) . . . that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) . . . that [the] movant suffered harm as a result.

Ashcraft v. Conoco, Inc., 218 F.3d 288, 301 (4th Cir. 2000); see also Rainbow Sch., Inc. v. Rainbow Early Ed. Holding LLC, 887 F.3d 610, 617 (4th Cir. 2018). "Although the movant has the initial burden of showing these elements by clear and convincing evidence, if he meets that burden, the burden of production shifts to respondent to raise a defense on an appropriate ground." Schwartz v. Rent-A-Wreck of Am., 261 F. Supp. 3d 607, 613 (D. Md. 2017).

"Willfulness is not an element of civil contempt." In re Gen. Motors Corp., 61 F.3d at 258. In other words, "[a]n act does not cease to be a violation of a law and of a decree merely because it

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

may have been done innocently" or in good faith. <u>Mountain Valley
Pipeline, LLC v. Easements</u>, No. 7:17-cv-00492, 2018 WL 2088762, at
*7 (W.D. Va. May 4, 2018) (alteration in original) (quoting <u>McComb
v. Jacksonville Paper Co.</u>, 336 U.S. 187, 191 (1949)).

### III. DISCUSSION AND CONCLUSIONS OF LAW

Although the Court addresses each element of civil contempt
below, the parties primarily dispute the third element, whether
Harris violated the Agreed Order by using net proceeds from the
sale of the Property to pay his attorney's fees. After careful
review, the Court concludes that the Agreed Order did not place an
unambiguous restraint on the Property, and that the Government has
not carried its burden to establish by clear and convincing
evidence that Harris is in contempt of the Agreed Order.

**A.    The Agreed Order is a valid decree of which Harris had actual
or constructive knowledge.**

First, the Government must establish the existence of a valid
decree of which the alleged contemnor had actual or constructive
knowledge. <u>Ashcraft</u>, 218 F.3d at 301. Harris does not dispute that
the Agreed Order is a valid decree of which he had actual knowledge
(Dkt. No. 274 at 9). The Government, therefore, has satisfied its
burden on the first element.

11

MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]

**B.    The Agreed Order was in the Government's favor.**

Second, the Government must establish that the decree was in
its favor. <u>Ashcraft</u>, 218 F.3d at 301. Harris also does not dispute
that the Agreed Order was in the Government's favor. Indeed, the
Order restrained assets for the express purpose of satisfying the
forfeiture money judgment and restitution levied on Saoud (Dkt. No.
201 at 3). The Government, therefore, has also satisfied its burden
with regard to the second element.

**C.    Harris did not knowingly violate the Agreed Order.**

Third, the Government must establish that Harris knowingly
violated the terms of the Agreed Order. <u>Ashcraft</u>, 218 F.3d at 301.
The statutory framework of criminal forfeiture illuminates the
question presented with regard to this element.

When a defendant such as Saoud is convicted of federal
healthcare offenses, the sentencing court "shall order the person
to forfeit property, real or personal, that constitutes or is
derived, directly or indirectly, from gross proceeds traceable to
the commission of the offense." 18 U.S.C. § 982(a)(7). "The
forfeiture of such property is effected—vesting the property's
title in the United States—'upon the commission of the act giving
rise to forfeiture . . . .'" <u>United States v. McHan</u>, 345 F.3d 262,

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

268 (4th Cir. 2003) (quoting 21 U.S.C. § 853(c)). "This 'relation back' principle in § 853(c) 'prevents defendants from escaping the impact of forfeiture by transferring assets to third parties.'" Id. (quoting United States v. Reckmeyer, 836 F.2d 200, 203 (4th Cir. 1987)). The Government may seek the pretrial restraint of tainted property that may be subject to forfeiture as gross proceeds traceable to the charged offense. See 21 U.S.C. § 853(e)(1)(A).

In addition, the Government may seek the forfeiture of untainted substitute property, which is "any other property of the defendant," if the tainted gross proceeds of the offense

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property which cannot be divided without difficulty.

Id. § 853(p). The Court looks beyond "bare legal title" to determine whether the defendant has a forfeitable interest. See In re Bryson, 406 F.3d 284, 291 (4th Cir. 2005) (quoting United States v. Morgan, 224 F.3d 339, 34 (4th Cir. 2000)).

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

Unlike the gross proceeds themselves, "title to substitute property vests in the Government upon order by the district court after conviction, at the latest." United States v. Marshall, 872 F.3d 213, 220 (4th Cir. 2017) (citing Luis v. United States, 136 S. Ct. 1083, 1101 (2016); United States v. Chamberlain, 868 F.3d 290, 297 (4th Cir. 2017)). Unless a defendant's "innocent property" is restrained by court order, he may use it to pay a reasonable fee for the assistance of counsel. See id.

Assuming that the Property is subject to forfeiture as substitute assets, the decisive inquiry is whether the Agreed Order placed a "clear and unambiguous" restraint on the Property. In re Gen. Motors Corp., 61 F.3d at 259. The Government contends that "[t]he text and context of the Agreed Restraining Order clearly establish that any general references to defendant Allen Saoud's property broadly encompassed all properties in which he had an equitable interest," including real estate owned by his corporate entities (Dkt. No. 311 at 14). Conversely, Harris contends that the plain language of the Agreed Order covers only the "Defendant's assets" that were owned personally, not assets held by third-party corporations (Dkt. No. 312 at 1).

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

### 1. Applicable Law

As an initial matter, the Court must decide how it is constrained to interpret the Agreed Order. In other words, does the Agreed Order apply to Harris as a contract, or should the Court apply the Agreed Order as one of general applicability?

Although interpretation of a consent order usually is confined to "its four corners," United States v. ITT Cont'l Baking Co., 420 U.S. 223, 233 (1975) (citing United States v. Armour & Co., 402 U.S. 673 (1971)), courts generally recognize that consent orders "embod[y] an agreement of the parties and [are] thus in some respects contractual in nature." Smyth ex rel. Smyth v. Rivero, 282 F.3d 268, 280 (4th Cir. 2002) (quoting Rufo v. Inmates of the Suffolk Cty. Jail, 502 U.S. 367, 378 (1992)); see also Anita's New Mexico Style Mexican Food, Inc. v. Anita's Mexican Foods Corp., 201 F.3d 314, 319 (4th Cir. 2000). Therefore, "[t]he 'interpretation of a consent decree or judgment is a question of contractual interpretation.'" In re Gilley, No. 12-11443, 2013 WL 690818, at *3 (Bankr. M.D.N.C. Feb. 26, 2013) (quoting G.G. Mark & Assocs., Inc. v. Peng, 309 F. App'x 928, 934 (6th Cir. 2009)).

The Government contends that, because a consent order "is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

other contract." ITT Cont'l Baking Co., 420 U.S. at 238. These
"include the circumstances surrounding the formation of the consent
order, any technical meaning words used may have had to the
parties, and any other documents expressly incorporated in the
decree." Id.; see also United States v. Volvo Powertrain Corp., 758
F.3d 330, 340 (D.C. Cir. 2014) (quoting Segar v. Mukasey, 508 F.3d
16, 22 (D.C. Cir. 2007)) (approving resort to extrinsic evidence of
parties' intent if an agreed order is ambiguous); Converse Inc. v.
Reebok Int'l Ltd., 328 F. Supp. 2d 166, 176 (D. Mass. 2004)
(analyzing whether a consent decree was ambiguous).

The Government, however, has failed adequately to address the
fact that Harris is not a party to the Agreed Order, nor that he
was not counsel of record at the time of its entry. In fact, McCoid
testified that he himself likely prepared the Order (Dkt. No. 308
at 43). Although Harris apparently remained somewhat involved in
Saoud's case, including discussions regarding the Agreed Order, see
supra Part I, the Court cannot agree that such limited evidence
establishes that Harris was "de facto co-counsel" (Dkt. No. 311 at
4). The Government simply has not established that Harris was in a
position to be bound by the Agreed Order in a contractual manner.

Having concluded that Harris is not a party to the Agreed
Order, the relevant inquiry remains whether the Agreed Order sets

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

forth an "unequivocal command" that is "clear and unambiguous," not whether the parties intended a particular restraint. See In re Gen. Motors Corp., 61 F.3d at 259; see also Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 18 (1st Cir. 1991) ("Put bluntly, a court's intentions and its orders are two different things."); Inmates of Allegheny Cty. Jail v. Wecht, 754 F.2d 120, 128-29 (3d Cir. 1985). Nonetheless, provisions of an order must not be read in isolation, but rather "in the context of the . . . Order as a whole." DeLorme Publ'g Co., Inc. v. Int'l Trade Com'n, 805 F.3d 1328, 1334 (Fed. Cir. 2015); see also Schwartz, 261 F. Supp. 3d at 614-15 (reviewing parties' conduct as context for whether contemnor had knowledge).

Indeed, the context of an order can be instructive when determining the conduct that a court means to enjoin. For example, in S.E.C. v. First Choice Management Services, Inc., the district court entered an agreed order that set forth the terms of a settlement among the parties. 678 F.3d 538, 540 (7th Cir. 2012). Defendant SonCo Holdings, LLC ("SonCo"), was to pay $600,000 for certain oil and gas leases and replace the current operator's $250,000 cash bond with the Texas Railroad Commission. SonCo paid the $600,000, but the Texas Railroad Commission refused to accept its bond without an appropriate application to operate the leases.

17

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

As a result, the district court held SonCo in contempt for failing to become the operator for the leases at issue. <u>Id.</u> at 540-41.

On appeal, SonCo argued that the agreed order did not specifically require it to become the operator. The Seventh Circuit acknowledged that "[t]he agreed order was poorly drafted," as it did not "say in so many words that SonCo [was] to become the operator." <u>Id.</u> at 542. Nonetheless, the agreed order required SonCo to replace the operator's bond, required the operator to provide things necessary for SonCo's operation, and gave SonCo time to prepare for operation. <u>Id.</u> at 542-43. Based on these requirements, the court found "strong hints that SonCo was to be the operator," and reasoned that the context of the entire order required it to do so. <u>Id.</u> at 543 (internal citation omitted). Therefore, the Seventh Circuit affirmed the contempt order. <u>Id.</u> at 546.

The context of a restraining order, however, does not always provide a sufficient basis to dispel ambiguity. In <u>United States v. Saccoccia</u>, the defendants were charged with engaging in a RICO conspiracy. 433 F.3d 19, 21 (2d Cir. 2005). Shortly after the grand jury returned its indictment, the Government obtained an <u>ex parte</u> protective order that restrained the defendants and their attorneys from transferring "$140,000,000 in U.S. currency for which the defendants . . . [were] jointly and severally liable." <u>Id.</u> at 22.

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

After the defendants were found guilty at trial, the Government sought to hold their attorneys in civil contempt for accepting almost $300,000 from the defendants. Id. at 26. Ultimately, the Second Circuit rejected the Government's argument.

First, the court reasoned that the restraint of "$140,000,000 in U.S. currency" was ambiguous because it failed to identify specific assets or distinguish between tainted and substitute assets. The order could have been interpreted in various ways:

> It could have meant that the court believed that all of Saccoccia's assets were tainted and that none could be used to pay attorneys' fees; but it did not say that expressly or even impliedly. It could have meant that at least $140 million in assets had to be preserved for the government, and that any party, including a lawyer, seeking payment of any kind from the Saccoccia coffers had to satisfy the court that he was being paid from the unprotected excess or would risk losing the assets. But it did not expressly say that either. It also could have been read to mean that the government had the right to identify up to $140 million in tainted assets that would be frozen, but also bore the burden of making specific identifications, leaving any of Saccoccia's assets not yet so identified presumed untainted and therefore freely transferable.

Id. at 29. In addition, several conversations among counsel and the district court demonstrated that "there was no clear understanding that all of Saccoccia's assets were in fact covered." Id. at 30. The Second Circuit also rejected the Government's argument "that any ambiguities . . . were resolved by the evidence adduced at

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

trial and by the jury verdict." In essence, the Government argued it was "common sense" that all the defendants' money was subject to the order. But the court reasoned that "civil contempt requires much more precision," and no fact finder had ever reached the conclusion that all the defendants' assets were tainted. Id.

2.   **Application**

The Agreed Order was undoubtedly too ambiguous to unequivocally restrain the net proceeds used to pay Harris's attorney's fees because neither the order's text nor context clearly encompasses the Property at issue. The Agreed Order implements an "agreement concerning disposition of various of Defendant's assets pending appeal" by restraining proceeds from the sale of specified property, as well as "any other real estate transactions" involving Saoud's property (Dkt. No. 201 at 1-4) (emphasis added). Although the Government contends that Harris's equitable interest in the Property was encompassed and restrained as "any other real estate," the predicate scope of the "Defendant's assets" is subject to several reasonable interpretations.

"Defendant's assets" is not defined in the Agreed Order, but Black's Law Dictionary defines an "asset" variously as "[a]n item that is owned and has value" or "[a]ll the property of a person . . . available for paying debts or for distribution." *Asset*,

20

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

Black's Law Dictionary (10th ed. 2014). It thus safely can be assumed that anyone reading "Defendant's assets" would understand that the Agreed Order has the potential to apply broadly to all of Saoud's property. Such a generalization, however, leaves important questions unanswered.

For instance, do the "Defendant's assets" encompass only personal and real property held in Saoud's name, including personally held real estate or ownership interests in corporate entities? Or should the phrase be interpreted broadly to cover pieces of property in which he may have a mere equitable interest, such as the assets of corporate entities with which he is associated? In that case, is the restraint limited to the percentage of Saoud's ownership interest, or does it cover all corporate property? Broader still, might the restraint of the Agreed Order reach assets that do not at first appear to be Saoud's, but that the Government might one day satisfactorily prove are "substitute assets"? The Agreed Order does not expressly say, and the Court is not persuaded by the Government's argument that other portions of the Agreed Order answer these questions.

For instance, the Government points out that the Agreed Order describes the Court's statutory authority to restrain substitute property, and that substitute property includes that "titled to

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

third parties—including corporate entities—if the defendant has a putative equitable interest in the property" (Dkt. Nos. 201 at 2; 311 at 14-16). The Agreed Order does not state, however, that it is restraining every available substitute asset, nor does it even state that it is restraining all of the "Defendant's assets." It also does not charge the reader or provide her with a metric for assessing whether Saoud has a "putative equitable interest."

Further, the Government contends that, because the properties specifically identified in the Agreed Order were owned by Saoud's corporate entities, the restraint of "any other real estate transactions" necessarily includes the Property, which also was held by Saoud's corporate entities (Dkt. No. 311 at 15, 17). Reasonable as the Government's interpretation may be, the Agreed Order does not identify the legal ownership of the properties specifically identified, instead referring to them as "[Saoud's] property" (Dkt. No. 201 at 3). In fact, the Agreed Order does not mention or even allude to the existence of corporate entities that Saoud controlled or in which he held an interest.

The Government also attempts to reinforce its interpretation of the Agreed Order by referencing other portions of the record in Saoud's case, but it does so to no avail. It contends that "the evidence in the underlying criminal case demonstrated that . . .

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

Saoud's corporate entities were, in fact, his alter egos. In particular, AGS Development LLC was used to facilitate the defendant's health care fraud scheme" (Dkt. No. 311 at 16). Moreover, Mrs. Saoud and Price testified in connection with the pending motion that Saoud treated corporate properties as his own. Id. But the fact that a corporate form was used to facilitate fraud does not necessarily mean that it should be disregarded for all purposes. Importantly, neither the jury nor the Court has ever made a factual finding that any specific corporate entity—much less every corporate entity—in which Saoud owned an interest was "in fact, his alter ego[]." See Saccoccia, 433 F.3d at 30-31.

Finally, the Government points to Saoud's PSR to establish the breadth of what it considers to be the "Defendant's assets" and property (Dkt. No. 311 at 16), but the PSR actually reinforces the Agreed Order's ambiguity. As discussed, the Probation Officer compiled a list of real property meant to represent Saoud's "equity in other assets" that included properties owned by corporate entities (Dkt. No. 290 at 52-54). The PSR expressly acknowledges, however, that some of the assets are Saoud's "personal assets," while other are "assets owned by ACC Properties, LLC; Allen-Sean Subsidiaries, LLC; Titanium Real Estate; AGS Development, LLC; and Prime Space, LLC." Id. at 54. Aside from identifying Saoud's

ownership interest in these companies, the PSR does not address their import. <u>Id.</u> at 57. If anything, the Probation Officer's passing reference to the distinction between personal and corporate assets renders the Agreed Order's reference to the "Defendant's assets" all the more ambiguous.

To sum up, the Court concludes that this case is far more analogous to <u>Saccoccia</u> than <u>First Choice</u>. Unlike the order at issue in <u>First Choice</u>, the text and context of the Agreed Order do little to disambiguate the scope of the "Defendant's assets" that are meant to be restrained. Quite to the contrary, even viewed against the backdrop of Saoud's entire criminal case, the Agreed Order is subject to several reasonable interpretations. Of course, "common sense" may dictate that Saoud effectively owned the real estate held by various corporate entities that he operated, and that the Government intended to restrain the Property when it endorsed the Agreed Order. But "civil contempt requires much more precision." <u>Saccoccia</u>, 433 F.3d at 30. It requires the Government to identify an "unequivocal command" that is "clear and unambiguous" in scope. <u>In re Gen. Motors Corp.</u>, 61 F.3d at 259. Because the Government has not done so in this case, it has not established by clear and convincing evidence that Harris violated the Agreed Order.

**MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION
TO HOLD ATTORNEY PAUL HARRIS IN CIVIL CONTEMPT [DKT. NO. 265]**

**D.    The Government has not suffered harm due to a violation of the
Agreed Order.**

Finally, the Government must establish that it suffered harm
as the result of Harris's violation of the Agreed Order. <u>Ashcraft</u>,
218 F.3d at 301. Given the Court's conclusion that Harris did not
violate the Agreed Order, the Government cannot prove that it was
harmed as the result of such a violation.

### IV. CONCLUSION

For the reasons discussed, the Court **DENIES** the Government's
motion to hold Harris in civil contempt (Dkt. No. 265).

It so **ORDERED**.

The Court **DIRECTS** the Clerk to transmit copies of this
Memorandum Opinion and Order to counsel of record.

DATED: July 3, 2018.

<u>/s/ Irene M. Keeley</u>
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE